Case No. 07-1141, et al., Ameren Services Company, et al., Petitioners vs. Federal Energy Regulatory Commission Ms. Warren, for Petitioners, Ameren Services Company, et al. Mr. Boedeker, for Petitioners, One Star Energy Ms. Rylander, for Respondent FERC And Mr. Kaplan, for Intervenors, Cargill, Power Markets LLC, et al. May it please the Court, Wendy Warren for the Ameren Companies. I would like to reserve three minutes for rebuttal. These consolidated appeals can be reduced to a single question. That's very helpful. Having read the briefs, knowing that this case is simple would help a lot. The question is, will the Court require FERC to enforce the just and reasonable filed rate, as it would have been in effect absent FERC's errors, from April 1, 2005 through November 10, 2008. For over three years throughout the multiple orders on review, FERC repeatedly reversed itself as to refunds, abusing its discretion and failing to engage in reasoned decision-making based on substantial evidence. All of the problems after the first year could have been avoided had FERC not misread the definition of capital E energy to create a discriminatory application of revenue sufficiency guarantee charges. And I hope you'll forgive me for the acronym, but that's a very long thing to say, so I'm going to say RSG charges that shifted over half of those charges to utilities with captive customers. The Court can correct all of FERC's errors by ordering FERC to enforce the just and reasonable filed rate properly interpreted from the market start. Why isn't this Court's opinion that it was issued after briefing in this case, in Louisiana Public Service opinion by Judge Williams? Why doesn't that just resolve this issue? Because in that case… It says that the Commission does have a policy of denying refunds in allocation cases, and that's what happened here. So as long as it has to consider these relevant factors, but FERC did here, and our review was highly deferential. Why doesn't that case just take care of this whole thing? Your Honor, that case was cost allocation, but it specifically singled out, carved out from that filed rate violation cases, and the RSG cases from the beginning and even through the 206 case are really a filed rate violation. MISO violated its rate from the outset, and FERC then tinkered with how that rate was supposed to work, forcing Ameren and others to file complaints, but the rate that would be applied, the likely complaint rate, was clear as far back as the first rehearing order. So it's not… It is a cost allocation case in the sense that that's what the tariff provision was meant to do, but MISO violated that cost allocation scheme and then further confused it by altering the definition of energy. But isn't every cost allocation case in a sense then a filed rate case? So the typical cost allocation case situation is one where there is a tariff rate, it is in effect, and someone files a Section 206 Federal Power Act complaint to change that rate, to say the existing rate is unjust and unreasonable, we're going to put in a new rate. And it's the reliance, people's reliance on the former rate and their inability to anticipate the new rate that makes the cost allocation cases an issue. It's also in those cases the concern is often having to rerun the market or change the market mechanism, and that issue is not present here. There's no need to rerun the energy market to calculate what the RSG charges should have been, how they should have been allocated. Doesn't the Commission disagree with you on that? I don't… Well, they say that the energy market needs rerunning, and I think what they mean by that is that parties may have made different market decisions if they had known that they would have been responsible for RSG charges. And our response to that is they should have known that they were responsible for RSG charges, and FERC said repeatedly, you have ample opportunity to adjust your behavior. So for them to then find that you couldn't have anticipated that makes no sense. So the only reason for the first year that FERC gave for reversing refunds, it acknowledged that the facts and the law that applied had not changed. With one exception, which I'll get to, FERC did not cite a changed view of a single argument it had already rejected. The only reason FERC gave for its new balancing was its changed view of the law was its changed view that it was reasonable for sophisticated market participants to ignore what the tariff says, to look at unfiled documents and emails from MISO and MISO presentations that were not filed, and ignore what the filed tariff said. And FERC said because it was reasonable for them to rely on those unfiled sources, there was nothing in the record to indicate an inequitable windfall. And I assume their reasoning is if it was reasonable to rely on the wrong thing, then the fact that you gained from that, you got a free ride from that, is not inequitable. We disagree. And that conclusion, that you could look to things other than the tariff, is contrary to FERC's statements earlier and at the same time they reversed the refunds, that we expect market participants to know what's in the filed tariff and follow it. I don't understand how, if you're expecting people to follow it, you're simultaneously excusing them from following it. And their claim that there was no record evidence of an inequitable windfall ignores the record evidence of amounts Ameren was overcharged. So in the first round of the RSG proceedings, FERC made all the right findings and choices with the exception of capital E and then reversed itself with no rational explanation. The capital E energy issue involves FERC's misreading of the tariff definition of energy. It's in quotes. It's capital E. And FERC's tortured reading excused the purely financial market participants from any RSG charges. And that- I thought FERC was interpreting the phrase, actually withdraws energy. Actually withdraws energy. That's what it was interpreting. It was interpreting the phrase, actually withdraws any capital E energy. Yeah. And this is, again, a deferential standard of review, right? It is. We're not deciding initially what that phrase means. We're asking whether FERC's interpretation of the phrase was unreasonable. Well, except that this is- FERC has conceded this tariff is unambiguous. And in that case- But it seems unambiguous, the word actually. Doesn't it? Yes, but the- So actually withdraws any are not capitalized. They're not defined. But the term energy, the word energy, is capitalized. And it has a definition given by the tariff. So it was unreasonable for FERC to completely ignore that capitalized definition in the tariff. I mean, tariffs have definitional clauses for a reason. And this Court has found that you should pay heed to those. The Supreme Court has found you should pay heed to defined terms. And that just it's irrational, if there is a tariff that has a defined term, that you would ignore that definition. I mean, there is a reason that that term was there with its definition. And that is to make the- So FERC's rebuttal to our point is there's nothing financial in the real-time energy market. But I don't see how price convergence could work if virtuals were not also in the real-time market. They have to buy back their obligation. So we pointed out the mismatch, and FERC said, well, you're worried about under-recovery. We weren't worried about under-recovery. We were worried that FERC was distorting the tariff and that its misreading was unjust and unreasonable. And the fruit of that misreading was that MISO implemented the original mismatch, which shifted millions of dollars from the purely financial market participants that should have been paying those charges to load-serving entities. Because it was all spread. Instead of being collected from the people it should have been collected from, it was spread over the entire- not over the entire market, but only over the load-serving entities. Go ahead. Your time's almost up. Okay. Or it is up. So FERC then flipped and portrayed that mistake that it had made as academic and reversed the refunds, saying that no one had objected, but Ameren's objection was actually before this court. We had filed it in 2007, and FERC had argued to hold it in abeyance. So then we get to the Section 206 proceeding, and FERC again ignores its own findings as to people had noticed, people understood what the rate was going to be, they could anticipate and accommodate with their behavior, but they didn't. And FERC said, well, no one could have predicted this significant increase. Okay. Nothing further? No. Thank you. Okay, thank you. Good morning, Your Honors. It may please the Court, my name is Sean Bodeker, and I represent Westar Energy in this proceeding. I've reserved one minute for rebuttal. Between November 2007 and November 2008, the time period at issue in Westar's appeal, Westar's energy traders actively bought power in the real-time ISO market. Every day Westar engaged in these transactions, Westar paid RSG costs for them, and Westar does not dispute the charges that it originally paid. But in June 2009, long after Westar had closed its transactions and had no ability to change its course of conduct, Westar found out that it owed a retroactive surcharge, which was more than double what it originally paid. This surcharge was unexpected, cost Westar millions, and served many of Westar's trades for the period from winners into losers. The surcharged amount did not have any relationship to the amount of costs that Westar imposed on the market during the time period, and FERC has never held otherwise. First treatment of Westar was markedly different than a set of other similarly situated market participants in MISO. These virtual-only entities not only did not have to pay a surcharge for that one-year time period, but did not have to pay any RSG charges whatsoever, even though they, like Westar, imposed RSG costs on the market. FERC's only rationale for its disparate treatment of these two similarly situated entities is its belief that an order FERC issued on November 5, 2007, what FERC labels the second compliance order, gave Westar and other market participants fair notice of how their charges would be allocated during the time period. But the second compliance order gave Westar and other market participants no fair notice. FERC did not definitively resolve how the tariff was to be interpreted and applied until more than one year after the second compliance order had been issued, which was after Westar had entered into its transactions and had no ability to change its course of conduct. And just three days after FERC determined how the tariff should operate, it ruled that the tariff was unjust, unreasonable, and discriminatory because it imposed costs on market participants like Westar that they did not cause in the market. In this case, Westar challenges FERC's selection of an appropriate refund effective date in the Section 205 proceeding. In the two orders that Westar challenges here, FERC claims that it selected the correct refund effective date because the second compliance order, which again was issued on November 5, 2007, provided a comprehensive explanation to market participants of how the RSG rate would be calculated between November 2007 and November 2008. But the second compliance order did not provide a comprehensive explanation. The primary issue that FERC was addressing in the Section 205 proceeding was how to interpret and apply the tariff. Why would we second-guess FERC's judgment on that question? Again, there are at least three honors. There's what? There are at least three reasons, Your Honor. First, MISO, which is the entity. Remember, this is a very deferential review we have here, right? Yes. Okay. Yes, Your Honor. But FERC only points to the second compliance order and states that it gave a comprehensive explanation, but we believe that's incorrect for at least three reasons. I see. First, MISO, the entity that's responsible for calculating and assessing the charge on market participants. But you disagree that it was comprehensive? We disagree that it was comprehensive. FERC is essentially imputing clarity to that order when at the time that it was issued it was not clear, and it wasn't clear for at least three reasons. First, MISO, the entity that's responsible for calculating and assessing this charge, interpreted the second compliance order to mean that all virtual volumes would be included in the denominator when calculating the charge and charge market participants like Westar accordingly during the time period. That application of the tariff was entirely consistent with FERC's earlier holding in the secondary hearing order, which was issued March 15, 2007, that the divisor to the charge includes all virtual volumes. That was how MISO was assessing the charge. That was Westar's understanding of the second compliance order, MISO's understanding of the second compliance order. FERC later ruled in the 4.3 hearing order, which it issued on November 7, 2008, it granted clarification as to what exactly the second compliance order meant and explicitly stated in paragraph 56, which is in the joint appendix at page 972, that only with the clarifications and modifications provided in that order was it clear exactly how the RRG rate would be interpreted and applied. But again, at that point, Westar had already entered into the transactions and had no ability to change its course of conduct. Finally, we don't believe that the second compliance order provided a comprehensive explanation because of the plain language of that order. For instance, paragraph 23 of the second compliance order, which is at page 678 of the joint appendix, noted that the rates to be applied would be determined on the basis of all virtual offers and deviations. It mandated that MISO make a compliance filing consistent with that finding, and again, MISO's compliance filing and MISO's understanding of FERC's order was that all virtual volumes would be included in the denominator. Now, FERC later reversed that ruling and held that certain virtual volumes should be excluded from the denominator, but we submit that that did not occur in the second compliance order. And again, FERC only relies on the second compliance order to support its interpretation, but it cannot rely on an erroneous description of its precedent to support its disparate treatment of two similarly situated entities. And because FERC is not adequately explained, its disparate treatment of similarly situated entities, its action is arbitrary and capricious and should be reversed. Thank you. Okay, thank you. We'll hear from FERC. Good morning. May it please the Court, Elizabeth Reinleiter for the Commission. As this Court has already noted, review in this case is very deferential and only for abuse of discretion. The Commission has significant remedial discretion, even in the face of a statutory or a tariff-like violation.  and the Court has the authority to review the case, like as Amrin speaks of, under the older case Towns of Concord. All FERC needs is substantial evidence that refunds are not warranted in a particular instance. It's the flip-flopping on the waiver of the refund issue that's the most troubling aspect of this. I mean, yeah, highly deferential, but at some point, doesn't it start to look maybe arbitrary and capricious? How do you handle the flip-flops? No, Your Honor. I would actually submit that the Commission's careful reexaminations of the requests for rehearing and the facts and evidence that were submitted in terms of what happened to the market, and I would mention this is a very new energy market. It was less than a year old in this case. FERC's careful reexamination of requests for rehearing and the evidence of the effect on the market of these various sets of refunds showed how careful it was being and how important the equities were and the overall... If you're a market participant, it's got to be more than a little frustrating, though, doesn't it? Yes, Your Honor, I imagine it was. And FERC's orders show the frustration that the regulators experienced as well. Every time FERC thought it had this rate right, something else happened to change the picture somewhat. Ameren pointed out in its opening argument that FERC said in the first rehearing order that its view of the facts and equities hadn't really... The view of the facts and the law hadn't really changed, but its view of the equities did every time that a refund scenario occurred. And what FERC would find out, and I'll use this first set of rehearings as an example, the refunds would create uncertainty and undermine faith in the market. The system operator pointed out that in order to make refunds happen in that first year would also have required the development of software and complicated calculations. Here's my concern. I mean, I understand that FERC's position, its default position, is not to give refunds... Yes, Your Honor. ...in these sorts of cases. Well, then, why on three occasions did FERC decide otherwise? And then reverse course. I would say, Your Honor, that once again this is an energy market that's less than one year old with a variety of market participants, a variety of interests. It's a very large geographical area, 15 states. I would say that perhaps FERC's experience and system operator's experience was not sufficient enough to predict what would really occur if refunds were ordered. And again, every time FERC did order refunds and every time the evidence came back that this is not beneficial to the market overall, that the equities are more complicated than they thought. Took three times to get that? Again, what's just puzzling to me, and you all are the experts in this, so this is a generalist coming to me, what's puzzling to me is that you start with this baseline, the default is you're not going to give refunds in these sorts of cases, right? And then three times you go ahead and give the refunds and then say, no, now we're taking it back. That's my concern. The orders also show, Your Honor, that FERC's policy with regard to refunds in organized markets was evolving simultaneously with the period of time that this case occurred. Two of the three Louisiana cases that are cited in the briefs and that were decided after briefing in this case occurred during the 12-year period this case took. And yes, FERC's position is against refunds in organized market cases, even when there's a tariff violation, FERC got there eventually, but it was in every circumstance two steps forward, one step back in order to get to the right result. If I could follow up quickly on the other two sets of refunds, the waiver of the mismatch refunds just simply created confusion in the markets, and as FERC acknowledged in the orders, FERC itself got the mismatch issue wrong a couple of times, but because the Commission had not made a legal error and was not determining the just and reasonable rate in those orders, there was no presumption in favor of refunds there, and as noted in the 6-3 hearing order at paragraphs 28-30, there was also no overcollection of the rate there. In the proceeding where FERC investigated and later amended the rate under Section 206, once again the Commission focused on market dynamics and found that the guarantee charge was the product of many interrelated factors. The Commission's expectations of what market participants would predict and would assume with regard to how the markets would work and what the eventual rate would be, the Commission expected too much, and particularly because there were two potential rate formulations at issue there, and once again a large number of market participants with a large variety of interests. It was not realistic to expect that everybody would correctly predict and instantly adjust to what became the eventual rate. And then finally as to Westar, Westar is not aggrieved by the orders that it challenges. They don't like the small RSG denominator that it was in effect for a year, but they had two opportunities to challenge it and they missed both of them. The interim rate took effect on November 10, 2008. That was set in the first paper rehearing order. Westar did not challenge that, and that was the end of the window that they don't like. Westar would not be aggrieved in the first place, and we don't concede that it is aggrieved, had Westar simply requested and received what it wanted in the complaint proceeding, and it was a party to that case. The November 5, 2007 date, which is the beginning of the window that Westar doesn't like, was set in the fifth rehearing order. That's the date the original rate was finally implemented as it was written on a forward-looking basis, but this order makes no new determinations as to what the effective rate was. Those determinations, as I believe Westar's counsel conceded, were made in the fourth rehearing order, which at that point was no longer subject to rehearing. So again, in view of the difficulty of this case and the Commission's careful balancing of the equities and consideration of the record, this Court should deferentially review the orders and affirm them. If the Court has no further questions... What about counsel's argument that in interpreting actually withdraws energy, FERC ignored capital energy? Yes, Your Honor. Ameren does say that the Commission misread the tariff and, in light of its misreading, essentially got the entire tariff proceeding wrong. Right. And FERC doesn't deny that the term energy, as it's used in the tariff, includes the notions of financial transactions. However, what is more important is the phrase actually withdraws, and counsel conceded in her argument that actually withdraws is really, or I think perhaps just the word actually, is not ambiguous. You cannot withdraw a virtual transaction from the grid, which is why the inclusion of financial concepts in the term energy does not affect what occurs in the real-time market. A virtual transaction cannot occur by itself in real time. It's the counterpart to something that already happened the previous day. And again, you cannot withdraw virtual megawatts from the grid, and the tariff says actually withdraws. Ameren's reading would take those two words, actually withdraws, out of the tariff altogether. Okay. Okay, thank you. Thank you. May it please the Court, I'm Stuart Kaplan, counsel for DC Energy, and here on behalf of the interveners. We share Judge Griffith's frustration with some of the rulings below representing financial participants that were very sensitive to transaction costs. I would like to begin with three general points based on what I've heard. First, to address Judge Griffith's concern about flip-flops, because the flip-flops were not actually acute with respect to the key rulings on the applicability of the charge as opposed to the calculation of the charge. Those are key distinguishing features. Second, I would need to address the petitioner's argument that this case is all about one question concerning violation of the file rate, which in actuality under the Commission's rational interpretation of the actual withdrawal of energy requirement only applies for one year period from April 2005 to April 2006, and only with respect to a small segment of virtual transactions at issue in this case, those of market participants that actually physically withdrew energy. And third, I will address Westar's argument on discrimination when in actuality the Commission ruled consistently in each case to apply the rate interpretation change or the actual rate change prospectively from the date of the first merits order so that market participants would have notice of what they were being charged. To begin with, the notion that this is only a single-question case is plainly wrong. There are four separate determinations which require separate legal analysis to handle them properly. An actual withdrawal of energy, Firk determined, was a prerequisite to apply the rate. From April 2005 to April 2006, the MISO did not apply the rate to any virtual supplies. It was nondiscriminatory in that sense. But Firk found it was a tariff violation. Six months later, in response to many requests for rehearing which discussed the factors that later became approved by this court and Louisiana Public Service Commission, Firk went through a rational balancing of the issues, articulating what it balanced. And we know that it didn't matter that it was a violation of the filed rate. It's a factor that has to be considered, no doubt. But it is not dispositive of Firk's discretion. Did Firk have discretion? Yes. Did it abuse its discretion? No, because it balanced LPSC factors even before they were articulated by this court more recently, including extenuating justifiable reliance on numerous MISO reports and training at market start, where all market participants, including the petitioners, were eligible to participate in any prudent utility I am sure did. As this court ruled in LPSC, to go back and take transactions and apply transaction costs that are multiples higher would be pulling the economic rug out from underneath the transactions. Now, second was the determination that the actual withdrawal of energy requirement was not satisfied by virtual transactions alone. This ruling was rational. The counsel for the respondent has already covered that. I'll answer any questions if you have them. But once you make that determination, as Firk did, two things happened. It removed the filed rate violation completely from the case, effective as of April of 2006. From all times after that, the actual energy withdrawal requirement was part of the filed rate until Firk changed it prospectively with the November 10, 2008 order in the complaint docket. The third is the rate mismatch issue, but I think I'll come back to that after addressing the 206 issue with my limited time. In the Section 206 proceeding, there's no question Firk had discretion. Initially, it did not apply the factors relevant in LPSC. Instead, Firk rushed to haste, implemented a rate, found out it caused tremendous market upheaval and harm, and then reversed itself in six months. So in both the initial 205 order and the subsequent 206 order, Firk did not flip-flop on applicability. Firk promptly determined that applicability would be resolved and that it would not apply a new rate or surprise parties quickly. It did the same thing with the flip-flop, with the final issue. My time's up, but I'd be happy to answer questions. Okay, thank you. Did Ms. Warren or Mr. Bowker have any time left? Okay, you can each take one minute, if you would like. I'd like to respond to the capital E energy point because Firk is still getting it wrong. When they say that there's no withdrawal, you can't actually withdraw a virtual offer from the grid. You can. Every virtual supply offer in the day ahead market is 100% withdrawn financially in the real-time market. That's why virtual supply offers are in the denominator of the RSG charge. And what Firk did was it said, yes, they're in the denominator of the RSG charge, but then they're not applied, and that's the mismatch. That's the breakage of the connection because of their irrational view that you can't actually withdraw a virtual supply offer. Every virtual supply offer is withdrawn. Otherwise, it wouldn't work. And I would just ask the Court to... Go ahead. Thank you. Finish your sentence. Yeah, you can finish your sentence, if you like. Oh. Yeah, go ahead. I would just ask the Court... Yeah. I would ask the Court to rectify Firk's many errors, which it can do under Excel Energy Services v. Firk. Thank you. Okay, fine. Mr. Bodeker. Yes, Your Honor. Briefly, I would just like to return to a point that Judge Tittle made at the very beginning of this argument. He indicated that this Court's recent decision in the LPSC case should control here, and that was a case in which Firk waived refunds when they would pull the economic rug out from underneath the market participants. I simply note that Firk has done that here for every single time period except for the one time period that Westar takes issue with, the November 2007 and November 2008 time period. And again, Firk only... Which Louisiana case are you talking about? The most recent one? The most recent one, yes. Yes, where this Court held that it was reasonable for Firk to waive refunds even if there was a filed rate violation where it would pull the economic rug out from transactions that market participants had already entered into. And Firk cites that precedent in supporting its waiver of refunds. And again, Firk has waived refunds for all time periods except for the one time period that Westar takes issue with, the November 2007 to November 2008 time period. And again, only proffers the second compliance order as justification for that. Thank you, Your Honor. Okay, thank you all. Case is submitted.
judges: Tatel, Griffith, Wilkins